UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* [UNDER SEAL],<br><br>Plaintiffs,<br><br>v.<br><br>[UNDER SEAL],<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 1:08-CV-251<br>MATTICE/CARTER<br>**FILED UNDER SEAL**<br><br><br>**JURY TRIAL DEMANDED** |
| UNITED STATES OF AMERICA<br>*ex rel.* [UNDER SEAL],<br><br>Plaintiffs,<br><br>v.<br><br>[UNDER SEAL],<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 1:12-CV-64<br>MATTICE/CARTER<br>**FILED UNDER SEAL**<br><br><br>**JURY TRIAL DEMANDED** |

**FILED UNDER SEAL**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*<br>GLENDA MARTIN,<br><br>Plaintiffs,<br><br>v.<br><br>LIFE CARE CENTERS OF AMERICA, INC.,<br><br>Defendant. | Civil Action No. 1:08-CV-251<br>MATTICE/CARTER<br>**FILED UNDER SEAL**<br><br>**JURY TRIAL DEMANDED** |
| UNITED STATES OF AMERICA, *ex rel.*<br>TAMMIE TAYLOR,<br><br>Plaintiffs,<br><br>v.<br><br>LIFE CARE CENTERS OF AMERICA, INC.,<br>*et al.,*<br><br>Defendants. | Civil Action No. 1:12-CV-64<br>MATTICE/CARTER<br>**FILED UNDER SEAL**<br><br>**JURY TRIAL DEMANDED** |

## UNITED STATES' CONSOLIDATED COMPLAINT IN INTERVENTION

The United States of America files this Consolidated Complaint in Intervention pursuant

to Rule 15(a)(1) of the Federal Rules of Civil Procedure.

1.     The United States brings this False Claims Act ("FCA") action against Life Care

Centers of America, Inc. ("Life Care") to recover millions of dollars that Life Care caused the

Medicare and TRICARE programs to pay for services that were not covered by the skilled

nursing facility benefit, that were not medically reasonable and necessary, and that were not

skilled in nature.

1

2. Medicare pays nursing facilities a daily rate to provide skilled nursing and skilled rehabilitation therapy services to qualifying Medicare patients (or "beneficiaries"). The daily rate that Medicare pays a nursing facility depends heavily on the rehabilitation needs of the beneficiaries. The highest daily rate that Medicare will pay a nursing facility is reserved for those beneficiaries that require "Ultra High" levels of skilled rehabilitation therapy, or a minimum of 720 minutes per week of skilled therapy from at least two therapy disciplines (*e.g.,* physical, occupational, and speech). The Ultra High therapy level is intended for the most clinically complex patients who require rehabilitative therapy well beyond the average amount of service time. TRICARE pays nursing facilities using the same system as Medicare.

3. From at least 2006 to the present, Life Care, a large nursing home operator, engaged in a systematic scheme to maximize the number of days it billed to Medicare and TRICARE at the Ultra High level. Life Care accomplished this by setting aggressive Ultra High-related targets that were completely unrelated to its beneficiaries' actual conditions, diagnoses, or needs. Life Care then reinforced those targets at corporate meetings and presentations, through regular emails from or visits by corporate personnel, through employee performance evaluations, by imposing action plans on underperforming facilities, and various other means. While Life Care punished those facilities and employees that failed to meet its Ultra High targets or that complained about corporate pressure, it rewarded and applauded those that met its targets. As part of its goal to maximize Medicare and TRICARE payments, Life Care also frequently overrode or ignored the recommendations of its own therapists and unnecessarily delayed discharging beneficiaries from its facilities.

4. As a direct result of Life Care's corporate pressure to maximize its Ultra High billings, Life Care therapists provided Medicare and TRICARE beneficiaries with excessive amounts of therapy that was not medically reasonable and necessary, and sometimes even

2

harmful. Moreover, instead of providing skilled rehabilitation therapy that was tailored to beneficiaries' particular needs, Life Care therapists routinely provided generic, non-individualized services that did not (and could not) benefit the beneficiaries and that served primarily to inflate what Life Care billed Medicare and TRICARE for those beneficiaries. Although Life Care received numerous complaints, from both inside and outside the company, that its corporate pressure to meet Ultra High targets was undermining the clinical judgment of its therapists at the expense of nursing home patients, Life Care largely ignored those complaints or else chastised or punished those who had complained.

5.      Life Care's corporate strategy and pressure succeeded in significantly increasing the number of days it billed at the Ultra High level and therefore inflating the money it received from Medicare and TRICARE. By 2008, for example, Life Care billed nearly 68 percent of its Medicare rehabilitation days at the Ultra High level—a level far in excess of the nationwide Ultra High average of 35 percent among all skilled nursing facilities during that same year.

6.      Because Life Care knowingly submitted false claims to the Medicare and TRICARE programs for medically unreasonable, unnecessary and unskilled therapy services, and used false records and statements to support those false claims, the United States brings this action to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-33 ("FCA"), and to recover damages and other monetary relief under the common law or equitable theories of unjust enrichment, disgorgement, and payment by mistake.

I.      **JURISDICTION AND VENUE**

7.      This Court has jurisdiction under 31 U.S.C. § 3730, and 28 U.S.C. §§ 1331 and 1345, and supplemental jurisdiction to entertain the common law causes of action under 28 U.S.C. § 1367(a). The Court may exercise personal jurisdiction over the defendant because the

3

defendant resides and/or transacts business in this District, or committed proscribed acts in this District.

8. Venue lies in this District pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. § 1391(b) and (c), as the place where the defendant resides and where a substantial part of the events or omissions giving rise to the claims occurred.

## II. PARTIES

9. The Plaintiff is the United States of America, acting on behalf of (a) the Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS"), which administers the Medicare program, and (b) the Department of Defense, including its component, the Tricare Management Activity, which administers the TRICARE Program.

10. Relator Glenda Martin is a registered nurse and a former staff development coordinator of Life Care Center of Morristown, d/b/a The Heritage Center, in Morristown, Tennessee. The Heritage Center is owned and operated by defendant Life Care. Martin commenced a *qui tam* action against defendant Life Care on October 16, 2008.

11. Relator Tammie Taylor is a former occupational therapist of Life Care Center at Inverrary, in Lauderhill, Florida. Taylor commenced a *qui tam* action against defendant Life Care on June 25, 2008, in the Southern District of Florida. That action was transferred to this Court on February 23, 2012.

12. Defendant Life Care is headquartered in Cleveland, Tennessee. Life Care is a for-profit corporation that manages and/or owns over 200 skilled nursing facilities across the country, including over 20 facilities in Tennessee. Medicare paid Life Care and its facilities over \$4.2 billion from January 2006 through December 2011 for inpatient services at its nursing facilities.

4

## III. FALSE CLAIMS ACT

13. The FCA provides, in pertinent part, that any person who:

   (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

   (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim...

* * *

   is liable to the United States Government [for statutory damages and such penalties as are allowed by law].

31 U.S.C. § 3729(a)(1)-(2) (2006), as amended by 31 U.S.C. § 3729(a)(1)(A)-(B) (West 2010).

14. The FCA further provides that "knowing" and "knowingly"

   (A) mean that a person, with respect to information-

      (i) has actual knowledge of the information;
      (ii) acts in deliberate ignorance of the truth or falsity of the information; or
      (iii) acts in reckless disregard of the truth or falsity of the information; and

   (B) require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b) (2006), as amended by 31 U.S.C. § 3729(b)(1) (West 2010).

15. The FCA, at 31 U.S.C. § 3729(a)(1), provides that a person is liable to the United States Government for three times the amount of damages which the Government sustains because of the act of that person, plus a civil penalty of $5,500 to $11,000 per violation.

## IV. THE MEDICARE PROGRAM

### A. Medicare Coverage Of Skilled Nursing Facility Rehabilitation Therapy

16. Congress established the Medicare Program in 1965 to provide health insurance coverage for people age 65 or older and for people with certain disabilities or afflictions. *See* 42 U.S.C. §§ 426, 426A.

5

17. The Medicare program is divided into four "parts" that cover different services. Medicare Part A generally covers inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation care.

18. Subject to certain conditions, Medicare Part A covers up to 100 days of skilled nursing and rehabilitation care for a benefit period (*i.e.*, spell of illness) following a qualifying hospital stay of at least three consecutive days. 42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. §409.61(b), (c).

19. The conditions that Medicare imposes on its Part A skilled nursing facility ("SNF") benefit include: (1) that the patient requires skilled nursing care or skilled rehabilitation services (or both) on a daily basis, (2) that the daily skilled services must be services that, as a practical matter, can only be provided in a skilled nursing facility on an inpatient basis, and (3) that the services are provided to address a condition for which the patient received treatment during a qualifying hospital stay or that arose while the patient was receiving care in a skilled nursing facility (for a condition treated during the hospital stay). 42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. § 409.31(b).

20. Medicare requires that a physician or certain other practitioners certify that these conditions are met at the time of a patient's admission to the nursing facility and to re-certify to the patient's continued need for skilled rehabilitation therapy services at regular intervals thereafter. *See* 42 U.S.C. § 1395f(a)(2)(B); Medicare General Information, Eligibility, and Entitlement Manual, Ch. 4, § 40.3.

21. To be considered a *skilled* service, it must be "so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel," 42 C.F.R. § 409.32(a), such as physical therapists, occupational therapists, or speech pathologists. *See* 42 C.F.R. § 409.31(a).

6

22. Skilled rehabilitation therapy generally does not include personal care services, such as the general supervision of exercises that have already been taught to a patient or the performance of repetitious exercises (*e.g.*, exercises to improve gait, maintain strength or endurance, or assistive walking). *See* 42 C.F.R. § 409.33(d). "Many skilled nursing facility inpatients do not require skilled physical therapy services but do require services, which are routine in nature. Those services can be performed by supportive personnel; e.g., aides or nursing personnel . . . ." Medicare Benefit Policy Manual, Chapter 8, § 30.4.1.1.

23. Medicare Part A will only cover those services that are reasonable and necessary. *See* 42 U.S.C. § 1395y(a)(1)(A); *see also* 42 U.S.C. § 1320c-5(a)(1) (providers must assure that they provide services economically and only when, and to the extent, medically necessary) ; 42 U.S.C. § 1320c-5(a)(2) (services provided must be of a quality which meets professionally recognized standards of health care).

24. In the context of skilled rehabilitation therapy, this means that the services furnished must be consistent with the nature and severity of the patient's individual illness, injury, or particular medical needs; must be consistent with accepted standards of medical practice; and must be reasonable in terms of duration and quantity. *See* Medicare Benefit Policy Manual, Ch. 8, § 30.

25. In order to assess the reasonableness and necessity of those services and whether reimbursement is appropriate, Medicare requires proper and complete documentation of the services rendered to beneficiaries. In particular, the Medicare statute provides that:

> No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period.

42 U.S.C. § 1395l(e).

7

**B.** **Medicare Payment for Skilled Nursing Facility Rehabilitation Therapy**

26. Under its prospective payment system ("PPS"), Medicare pays a nursing facility a pre-determined daily rate for each day of skilled nursing and rehabilitation services it provides to a patient. *See* 63 Fed. Reg. 26,252, 26,259-60 (May 12, 1998).

27. The daily PPS rate that Medicare pays a nursing facility depends, in part, on the Resource Utilization Group (RUG) to which a patient is assigned. Each distinct RUG is intended to reflect the anticipated costs associated with providing nursing and rehabilitation services to beneficiaries with similar characteristics or resource needs. From January 1, 2006, to October 1, 2010, there were 53 RUGs in the so called "RUG-III" classification system. *See* 70 Fed. Reg. 45,026, 45,031 (Aug. 4, 2005).

28. There are generally five rehabilitation RUG levels for those beneficiaries that require rehabilitation therapy: Rehab Ultra High (known as "RU"), Rehab Very High ("RV"), Rehab High ("RH"), Rehab Medium ("RM"), and Rehab Low ("RL").

29. The rehabilitation RUG level to which a patient is assigned depends upon the number of skilled therapy minutes a patient received and the number of therapy disciplines the patient received during a seven-day assessment period (known as the "look back period"). The chart below reflects the requirements for the five rehabilitation RUG levels under the RUG-III classification system.

| Rehabilitation RUG Level | Requirements to Attain RUG Level |
|---|---|
| RU = Ultra high | minimum 720 minutes per week total therapy combined from at least two therapy disciplines; one therapy discipline must be provided at least 5 days per week |
| RV = Very high | minimum 500 minutes per week total therapy; one therapy discipline must be provided at least 5 days per week |
| RH = High | minimum 325 minutes per week total therapy; one therapy discipline must be provided at least 5 days per week |

8

| RM = Medium | minimum 150 minutes per week total therapy; must be provided at least 5 days per week but can be any mix of therapy disciplines |
| RL = Low | minimum 45 minutes per week total therapy; must be provided at least 3 days per week but can be any mix of therapy disciplines |

Source: 63 Fed. Reg. at 26,262

30. Medicare pays the most for those beneficiaries that fall into the Ultra High RUG level. The Ultra High ("RU") RUG level is "intended to apply only to the most complex cases requiring rehabilitative therapy well above the average amount of service time." 63 Fed. Reg. 26,252, 26,258 (May 12, 1998).

31. In addition to reflecting a patient's rehabilitation therapy needs, each RUG also reflects the patient's ability to perform certain activities of daily living ("ADL"), like eating, toileting, bed mobility and transfers (e.g., from a bed to a chair). A patient's ADL score (ranging from A to C) reflects his or her dependency level when performing an ADL. A very dependent patient, who cannot perform any of the ADLs without assistance, would generally receive an ADL score of "C," while a patient who could perform the ADLs without assistance would receive an ADL score of "A."

32. In addition to the ADL scores of A, B, and C, Medicare provides "X" and "L" ADL scores for those beneficiaries that require "extensive services" in addition to rehabilitation therapy. Extensive services include intravenous treatment, ventilator or tracheostomy care, or suctioning. A very dependent rehabilitation patient who requires more extensive services would generally receive an ADL score of "X," while a patient who needs only one of the extensive services might receive an ADL score of "L."

33. To provide a sense of the tremendous impact that a RUG level or ADL score has on the Medicare daily rate, provided below is a summary chart reflecting the adjusted rates that

9

Medicare paid nursing facilities for rehabilitation beneficiaries in fiscal year 2006. Medicare adjusts base rates annually and based on locality. *See* 42 U.S.C. § 1395yy(e)(4)(E)(ii)(IV).

| RUG Rates: Federal Rates for Fiscal Year 2006 | | | | | |
|---|---|---|---|---|---|
| | **Rehab with Extensive Services** | | **Rehab without Extensive Services** | | |
| **RUG Level** | **X** | **L** | **C** | **B** | **A** |
| RU | $ 564.83 | $ 496.04 | $ 479.53 | $ 439.62 | $ 418.99 |
| RV | $ 428.24 | $ 399.34 | $ 385.59 | $ 366.32 | $ 329.17 |
| RH | $ 363.02 | $ 356.14 | $ 335.50 | $ 320.36 | $ 296.97 |
| RM | $ 415.57 | $ 381.17 | $ 308.25 | $ 299.99 | $ 293.11 |
| RL | $ 295.03 | (not applicable) | (not applicable) | $ 271.64 | $ 231.74 |

34.     CMS has made certain modifications to the RUG-III structure through its RUG-IV classification system, which became effective October 1, 2010. CMS added new clinical RUG categories, modified the timeframe in which each assessment must be performed, required that nursing facilities assess changes in the level of therapy every seven days, and revised certain rules pertaining to group therapy, among other changes. 74 Fed. Reg. 40,288 (Aug. 11, 2009).

## C.     Statements And Claims To Medicare For Payment Of Skilled Nursing Facility Rehabilitation Therapy

35.     Medicare requires nursing facilities periodically to assess each patient's clinical condition, functional status, and expected and actual use of services, and to report the results of those assessments using a standardized tool known as the Minimum Data Set ("MDS"). The MDS is used as the basis for determining a patient's RUG level and, therefore, the daily rate that Medicare will pay a nursing facility to provide skilled nursing and therapy to that patient.

36.     In general, a nursing facility must assess each patient and complete the MDS form on the 5th, 14th, 30th, 60th, and 90th day of the patient's Medicare Part A stay in the facility. The date the facility performs the assessment is known as the assessment reference date. A nursing facility may perform the assessment within a window of time before this date, or, under certain

10

circumstances, up to five days after. When a nursing facility performs its assessment (except for the first assessment), it looks at the patient for the seven days preceding the assessment reference date. As discussed above, this seven day assessment period is referred to as the "look-back period."

37. The MDS collects clinical information on over a dozen criteria, including hearing, speech, and vision; cognitive patterns; health conditions; and nutritional and dental status. Section P of the MDS ("Special Treatments and Procedures") collects information on how much and what kind of skilled rehabilitation therapy the facility provided to a patient during the look-back period. In particular, Section P shows how many days and minutes of therapy a nursing facility provided to a patient in each therapy discipline (*i.e.,* physical therapy, occupational therapy, and speech-language pathology and audiology services). As discussed below, the information contained in Section P directly impacts the rehabilitation RUG level to which a patient will be assigned.

38. In most instances, the RUG level determines Medicare payment prospectively for a defined period of time. *See* 63 Fed. Reg. at 26,267.[1] For example, if a patient is assessed on day 14 of his stay, and received 720 minutes of therapy during days 7 through 14 of the stay, then the facility will be paid for the patient at the Ultra High RUG level for days 15 through 30 of the patient's stay.

39. Prior to October 1, 2010, the nursing facility would electronically transmit the MDS form to a state's health department or other appropriate agency, which in turn would transmit the data to CMS. 42 C.F.R. § 483.20(f)(3) (2008); 42 C.F.R. § 483.315(h)(1)(v) (2008).

---

[1] Payment for days 1 through 14 is based on the number of therapy minutes provided through the five-day assessment, as well as an estimate of the number of minutes to be provided through day 14. *See* 63 Fed. Reg. at 26,265-67; 64 Fed. Reg. at 41,662.

11

Since October 1, 2010, nursing facilities transmit the data directly to CMS. 42 C.F.R. § 483.20(f)(3).

40.     Completion of the MDS is a prerequisite to payment under Medicare. *See* 63 Fed. Reg. at 26,265. The MDS itself requires a certification by the provider that states, in part: "To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements. I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds." Minimum Data Set (MDS) – Version 2.0 for Nursing Home Resident Assessment and Car Screening.

41.     A patient's RUG information is incorporated into the Health Insurance Prospective Payment System (HIPPS) code, which Medicare uses to determine the payment amount owed to the nursing facility. The HIPPS code must be included the CMS-1450, which nursing facilities submit electronically to Medicare for payment. Medicare Claims Processing Manual, Ch. 25, § 75.5. Medicare payment will depend largely on the HIPPS code the nursing facility submitted as part of the CMS-1450. *See* 63 Fed. Reg. at 26,267; Medicare Claims Processing Manual, Ch. 25, § 75.5.

42.     Skilled nursing facilities submit the CMS-1450 electronically under Medicare Part A to Medicare payment processors, known as Medicare Administrative Contractors ("MACs"), formerly known as Fiscal Intermediaries ("FIs"). MACs process and pay Medicare claims. From at least January 2006 through August 2009, BlueCross BlueShield of Tennessee (also known as "Riverbend Government Benefits Administrator") was the FI/MAC for all Life Care skilled nursing facilities across the country. From August 2009 to the present, Cahaba Government Benefit Administrators has been the MAC for the Life Care chain.

12

## V.    TRICARE

43.     TRICARE (formerly CHAMPUS) is a federally funded medical benefit program established by statute. 10 U.S.C. §§ 1071-1110. TRICARE provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents.

44.     TRICARE covers the same skilled nursing services as Medicare. The regulatory authority implementing the TRICARE program provides reimbursement to health care providers applying the same reimbursement scheme and coding parameters that the Medicare program applies. 10 U.S.C. §§1079(j)(2) (institutional providers).

45.     TRICARE, like Medicare, pays only for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. § 199.4(a)(1)(i).

46.     TRICARE follows Medicare's PPS and RUGs methodology and assessment schedule, and beneficiaries are assessed using the same MDS form used by Medicare. TRICARE Reimbursement Manual 6010.58M, Ch. 8, § 2, 4.3.5 – 4.3.7, 4.4.3.

47.     Under the TRICARE for Life program, there are beneficiaries who are enrolled in Medicare and are still eligible for TRICARE ("dual eligible beneficiaries"). For these dual eligible beneficiaries, TRICARE is the secondary payor to Medicare and is responsible to the skilled nursing facility for any amounts not covered by Medicare. *Id.* at 4.4.

48.     TRICARE prohibits practices such as submitting claims for services which are not medically necessary, consistently furnishing medical services that do not meet accepted standards of care, and failing to maintain adequate medical records. 32 C.F.R. §§ 199.9(b)(3)-(b)(5). TRICARE considers "[b]illings or CHAMPUS claims which involve flagrant and persistent overutilization of services without proper regard for results, the patient's ailments, condition, medical needs, or the physician's orders" to be fraud. 32 C.F.R. § 199.9(c)(3). Such

13

practices are deemed abusive and cause financial loss to the United States. 32 C.F.R.

§§ 199.9(b).

49.     For TRICARE dual eligible beneficiaries, TRICARE follows Medicare's

determination regarding medical necessity. If services are determined not to be medically

necessary under Medicare, they are not covered under TRICARE. TRICARE Reimbursement

Manual 6010.58M, Ch. 8, § 2, 4.3.16 (Note).

## V.     LIFE CARE SYSTEMATICALLY PRESSURED ITS REHABILITATION THERAPISTS TO MEET CORPORATE ULTRA HIGH AND AVERAGE LENGTH OF STAY TARGETS IN ORDER TO MAXIMIZE ITS MEDICARE REVENUE.

50.     Because Medicare paid significantly more money for Ultra High beneficiaries

than for beneficiaries at lower RUG levels, Life Care aggressively pushed its facilities and

therapists to get as many of its Medicare beneficiaries into the Ultra High RUG level as possible.

Life Care accomplished this by setting and enforcing aggressive targets for the percentage of

Medicare rehabilitation days its facilities had to bill at the Ultra High RUG level, with little

regard to the individualized needs of its Medicare patients. Life Care enforced these Ultra High

targets at every level of its corporate hierarchy.

51.     "Average length of stay" refers to the average number of days that a facility's

beneficiaries stayed at the facility and, as described above, Medicare pays nursing facilities, per

patient, per day. Life Care also pressured its facilities and therapists to extend their Medicare

beneficiaries' stays in Life Care facilities to maximize Medicare revenue. This practice ignored

patient needs and sometimes resulted in beneficiaries unnecessarily exhausting all 100 days of

their Medicare SNF benefit (leaving the beneficiaries with no Medicare Part A coverage for at

least 60 days if the beneficiaries later actually needed skilled nursing or rehabilitation care). As

14

with its Ultra High RUG targets, Life Care pushed its average length of stay targets at every level of the corporate hierarchy.

52. These corporate pressures caused Life Care therapists to provide excessive amounts of therapy that were not medically reasonable or necessary. Because the corporate targets were based in part on providing a specific number of therapy minutes per Medicare patient, therapists often did not develop individualized plans of care for patients. In addition, the corporate pressure caused Life Care therapists to provide services that did not qualify as skilled rehabilitation therapy simply to meet the ever-increasing demands of higher Ultra High targets.

53. As Life Care explained in a draft of its "[Prospective Payment System] 101 for Therapists" guidance, the "bottom line" on RUG levels is that the "therapists are determining how much reimbursement the facility will receive for each individual patient," and "[t]he more minutes a patient can tolerate, the more money the facility can get reimbursed for."

A. **Life Care's Rehabilitation Therapy Hierarchy**

54. Given the importance of therapy minutes to its beneficiaries' RUG levels and therefore its own Medicare revenue, Life Care closely managed the productivity levels of its facilities and of its rehabilitation therapists at every level of its corporate hierarchy.

55. Life Care generated numerous reports (*e.g.,* monthly rehab snapshot report, 12 month key indicator report, Medicare book rate reports) that closely tracked, among other things, its facilities' Ultra High percentages, average length of stay levels, and the productivity levels of its facilities at every level of the corporate hierarchy.

56. During most of the relevant period, Cathy Murray, Life Care's former Chief Operating Officer, aggressively drove the company's push for increased Medicare revenue. As she frequently told her employees, their job was to make money for Forrest Preston, the founder, sole shareholder, and Chairman of the Board of Life Care.

15

57. At the top of Life Care's corporate rehabilitation therapy hierarchy was the "Rehabilitation Services" office. During most of the relevant period, Michael Reams, Senior Vice President of Rehabilitation Services, headed this office.

58. During the relevant period, Life Care divided its facilities into several divisions across the country. These included the Eastern, Garden Terrace, Heartland, Mountain States, Northeast, Northwest, Southeast, and Southwest divisions. Divisional personnel included, among others, a Divisional Vice President and Divisional Rehabilitation ("Rehab") Director. Divisional Rehab Directors reported directly to Michael Reams and managed the Regional Rehab Directors within their respective divisions.

59. Each Life Care division oversaw and managed approximately 29 "regions" across the country. Each regional office included, among others, a Regional Vice President and a Regional Rehab Director. The Regional Rehab Director managed the Rehabilitation Services Managers ("Rehab Managers") assigned to the facilities within his or her region.

60. The facility Rehab Manager was the primary person responsible for managing the rehabilitation therapy staff at each facility and for ensuring that the therapists met the Ultra High and average length of stay targets. Although stationed at a facility, the Rehab Manager reported to and was evaluated by his or her Regional Rehab Director.

61. The Rehab Manager also reported to the facility's Executive Director (also known as the Administrator), who was in charge of the entire SNF facility. The Executive Director, in turn, reported to the Regional Vice President and Divisional Vice President. Although the Executive Directors typically had no training or certification in skilled rehabilitation therapy, they often took an active role in setting and achieving rehab targets for individual beneficiaries and enforcing Life Care's corporate Ultra High and average length of stay targets.

16

62.    The therapy staff of each facility was typically comprised of physical therapists, physical therapy assistants ("PTAs"), occupational therapists, certified occupational therapy assistants ("COTAs"), and speech-language and pathology therapists. Some rehab departments also employed physical therapy aides, unlicensed personnel who typically could not perform skilled therapy services – if at all – without supervision. Many Life Care SNFs also employed either directly or through a third-party company contract therapists and/or therapy assistants, who would provide additional therapy staffing on an as-needed basis.

63.    Lastly, each Life Care SNF employed at least one MDS coordinator. The MDS coordinator, usually a registered nurse, was supposed to be responsible for, among other things, collecting all the information needed for the MDS and determining the assessment reference date (and thus the seven-day look-back period that would be used to determine each patient'sRUG level). In practice, however, the Rehab Manager would often overrule the MDS coordinator and determine the assessment reference date, choosing the days that would result in the highest RUG level, and thus, the highest payment to Life Care.

64.    Life Care submitted the MDS forms to the appropriate state agencies (prior to October 2010) and then CMS (after October 2010) with the intention that Medicare would rely upon the MDS information to set patient RUG levels and pay Life Care claims based on those patient RUG levels.

## B.    Life Care Set And Enforced Ultra High and Length of Stay Targets

65.    In order to maximize its Medicare revenue, Life Care set targets for the percentage of Medicare rehabilitation days it wanted its divisions, regions, and facilities to bill at the Ultra High level. Life Care also set targets for the average length of stays of Medicare patients at its facilities. Life Care set these targets at the corporate level without any knowledge of or regard for the individualized medical needs of its Medicare beneficiaries.

17

66. Life Care conveyed and reinforced its Ultra High RUG and length of stay targets in many ways, including divisional and regional meetings and presentations.

67. For example, in a January 2008 powerpoint presentation titled "Kick Off Rehab Opportunities," Life Care stated its goal that "All Divisions @ 50% RU (*i.e.,* Ultra High) or higher" in 2008. In that same presentation, Life Care highlighted those divisions with the highest Ultra High percentages of their Medicare rehabilitation days (*i.e.*, Southeast (70.8 percent), Heartland (51.7 percent) and Mountain (50 percent)) and those divisions that had increased their Ultra High percentages the most in 2007.

68. In a Southeast Division presentation titled "2008 Division Goals," Life Care stated its target that the Southeast Division "[m]aintain RU at 70% for division;" that the Divisional Rehab Directors, Regional Rehab Directors, and the facility Rehab Managers accomplish that goal; and that "therapy teams [are] fully educated to maintain or exceed current RU level of 70% division-wide."

69. Notably, Life Care's 70 percent Ultra High target was more than double the percentage of Ultra High rehabilitation days billed to Medicare by all nursing facilities nationwide in 2008 (*i.e.,* 34 percent). Health Care Financing Review, 2009 Statistical Supplement, Table 6.9.

70. Life Care communicated and reinforced its Ultra High RUG and average length of stay targets through emails sent by its Divisional and Regional Rehab Directors.

71. Such emails frequently included monthly "Rehab Key Indicators" reports, which tracked the performance of every Northeast Division facility using metrics like Ultra High percentages and rehabilitation length of stay.

72. The July 2006 Rehab Key Indicators report, for example, reflected the end of the year Ultra High target of 35 percent and the average length of stay target for rehabilitation

18

patients of 31 days. While the Northeast Division aimed to have 35 percent of its Medicare rehabilitation days at the Ultra High RUG level in 2006, Ultra High days constituted only 22 percent of all Medicare rehabilitation days nationwide in 2006. Health Care Financing Review, 2007 Statistical Supplement, Table 6.9.

73.     Also in 2006, Antoinette Muelke, then the Regional Rehab Director for the Sun States region in Florida, sent an email on June 8 to all the Rehab Managers in her region asking those managers whose facilities had Ultra High percentages below *61 percent* to create an action plan on "how you will make it happen" that month.

74.     Among the tips that Muelke offered, without having met, seen, or evaluated a single patient, was:

> A 5-10 minute increase of the minutes daily can make a difference of 50-140 minutes in a week- [depending] on your schedule= 2 disciplines 5-7 days a week. A 15 [minute] increase per day can make a 210 [minute] difference in a 7 day 2 discipline coverage[.] THAT IS A RU INSTEAD OF A RV[.]

(Emphasis in original).

75.     Life Care reinforced its Ultra High RUG targets through the mantra that "everyone admitted will receive 2+ hours of therapy per day unless proven otherwise."

76.     For example, in a presentation given at a Bluegrass Region meeting for Rehab Managers in March 2007, Life Care stated that "[Executive Director], RSM [Rehab Services Manager] and rehab team will develop the RU philosophy" and "All [Life Care Center] residents to receive 2+ hrs of therapy per day. We start at 2+ hrs and adjust from there."

77.     While Life Care presentations in 2006 and 2007 reflected a daily target of 2 hours of therapy, by 2008 Life Care presentations reflected an increase in the corporate target that "[e]veryone admitted will receive **2.5** hours of therapy per day unless proven otherwise."

(Emphasis added.)

19

78.     Life Care made its Rehab Managers "prove otherwise" in various ways. In some divisions, Rehab Managers had to submit regular emails to their Regional Rehab Directors and other regional staff to justify why particular beneficiaries failed to qualify for the Ultra High RUG level or why beneficiaries were downcoded from Ultra High to a lower RUG level.

79.     In the Heartland Division, Rehab Managers had to submit their RUG level information to a Resource Utilization Specialist who would question facility employees about any beneficiaries that failed to reach the targeted RUG level.

80.     This Resource Utilization Specialist questioned the rehabilitation therapy provided to each patient even though she was a not a physical, occupational, or speech language pathologist, but rather a registered nurse. Moreover, the Resource Utilization Specialist conducted her reviews remotely without having met, evaluated, or seen the beneficiaries and without having reviewed their medical charts.

81.     In one email, for example, the Resource Utilization Specialist asked about one patient, "why rehab high with 3 therapies treating?" rather than reaching a higher RUG level (e.g., Ultra High or Very High). In another email, she asked whether a different patient would be appropriate for additional therapy because the patient would only need "about 6-7 minutes per day more therapy to get to the next [billing] category." In yet another email, she asked why therapy staff "missed very high [RUG level] by 50 minutes . . . ."

82.     Just as divisional and regional staff closely monitored Ultra High levels, they also scrutinized their facilities' average lengths of stay and forced their facility staff to defend patient stays that were deemed to be too short.

83.     For example, in May 2006, the executive director of Life Care Center of Kansas City had to defend to the Plains Region Director of Clinical Services and Director of Marketing why two Medicare beneficiaries had been discharged after a "short" length of stay.

20

Notwithstanding the Executive Director's explanation that the two beneficiaries were discharged because they had met all their rehabilitation goals, the Regional Director of Clinical Services explained:

> If I am called prior to discharge from Medicare — I do walk them through everything possible before they are discharged whether it is related to what they are being skilled for or not. You have the format to follow before calling me. You guys need to call me prior to discharging from Medicare — and then I can be the one to say "YES,' all their goals were met. And then maybe we won't have to go through all these questions.

## C. Life Care Used Its Rehabilitation Opportunity Committee To Identify And Pressure Facilities That Were Not Meeting Corporate Targets

84.     Life Care also used its Rehabilitation Opportunity Committee (or Rehab Performance Committee) to push its facilities and therapists to achieve its Ultra High and length of stay targets.

85.     In 2005, Life Care established this committee to increase Medicare revenues from the provision of rehabilitation therapy services and to attain higher Medicare RUG levels for its Medicare beneficiaries. Life Care also established the committee to help move all divisions to 50 percent or greater Ultra high levels. In 2005, Ultra High days constituted only 8.9 percent of all Medicare rehabilitation days nationwide. Health Care Financing Review, 2007 Statistical Supplement, Table 6.9.

86.     The Rehabilitation Opportunity Committee consisted of high ranking Life Care executives, including Forrest Preston (Life Care's sole shareholder and Chairman of the Board), Cathy Murray (Life Care former Chief Operating Officer), and Michael Reams (Life Care Senior Vice President of Rehabilitation Services).

87.     One of the Rehabilitation Opportunity Committee's functions was to identify those facilities that failed to meet Life Care's financial targets and to help them to increase their

21

Ultra High billings. Life Care referred to these underperforming facilities as "focus facilities," subjected those facilities to increased corporate scrutiny, and mandated that the facilities provide additional therapy without regard to their beneficiaries' actual needs.

88.    Life Care's senior management visited the focus facilities on a frequent basis, including quarterly visits from the Rehabilitation Services office, monthly visits from the Divisional Rehab Directors, and weekly visits from Regional Rehab Directors. Following the visits, Life Care management created "action plans" that required the facilities to use specific therapeutic techniques for the purpose of increasing the amount of billable therapy.

89.    In a July 2006 Performance Improvement and Growth Plan for Life Care's Hallmark Manor facility in Denver, Colorado, Life Care noted that, in response to a 23 percent Ultra High percentage in June 2006, its current action plan was to "convert 50% of RV to RU by increas[ing] service/delivery/utilization."

90.    Other action plans focused on increasing the length of stay through Life Care's "Ready to Go" (or "Ready, Set, Go") program. Life Care employees viewed the program as an artificial means of extending a patient's length of stay; it was frequently used to elongate patient stays by waiting to address home skills training until the end of a patient's stay, when they were already ready for discharge, rather than incorporating that training throughout the duration of the stay. Moreover, the program included billing Medicare for unskilled care, such as taking beneficiaries grocery shopping and watching them clean; improper billing for "therapy" that was provided in groups or concurrently, not individually; and typically involved double-billing Medicare for the same activities.

91.    A facility's failure to accomplish the goals or directives set forth in the action plans resulted in increased corporate scrutiny and more frequent corporate visits or personnel changes.

22

## D. Life Care Pushed Facilities To Increase Ultra High Levels During Facility Visits

92.     Life Care Regional Rehab Directors regularly visited their facilities, sometimes

on a monthly or weekly basis. Although they reviewed a number of factors, the Regional Rehab

Directors focused particularly on pushing the facilities to increase the number of Ultra High

billable minutes. Written summaries documenting the visits commonly reflected Life Care's

Ultra High targets, contained criticisms of those facilities that failed to meet those targets, and

provided guidance to the facilities on therapeutic techniques they could employ to help increase

their billable therapy minutes.

93.     For example, a June 2007 Facility Visit Summary for Life Care Center of

Paradise Valley, in Las Vegas, Nevada, noted:

> [M]issed RU in the other 3 out of the 5 assessments by approximately 70-
> 100 minutes . . . . Noted significant improvement of RU from April 2007
> = 45.30% to May 2007 = 52.3% with [Year To Date] = 37.4%. *Facility is*
> *on target to achieve pre-set goal of 65-70% RU. Advised [Rehabilitation*
> *Services Manager] to continue to focus energies towards setting minutes*
> *to achieve RU level not only for the 5 day assessments but also the 14*
> *day and 30 day assessments if appropriate.*

(Emphasis added).

94.     Likewise, a May 2006 Facility Visit Summary for Life Care's Bridgeview Estates

facility in Twin Falls, Idaho, stated that the "[Regional Rehab Director] encouraged a trend

where RU was a greater focus including over the next 3 months doubling to tripling RU and

halving the RV trends."

95.     In a Facility Visit Summary dated December 13, 2006, the Regional Rehab

Director criticized the facility Rehab Manager at the Inverrary facility in Lauderhill, Florida, for

failing to consistently maintain the Ultra High RUG level, noting that "[i]f residents were able to

tolerate at least 720 mins/week, there should be no need to ramp them down to a lower Rehab

category[.]"

23

96.    In that same December 2006 Facility Visit Summary, the Regional Rehab

Director urged the facility to utilize "Saturday and Sundays to assign [patient] treatment in order

to capture RU or 720 minutes (especially 5 and 14 day assessments)." A week later, a follow-up

report stated that the Rehab Manager had already increased – in one week – daily minutes to

attain the Ultra High RUG level for residents who were able to tolerate more therapy, changed

therapy for new beneficiaries from three to five days a week in all three disciplines, and provided

therapy to beneficiaries on Saturdays and Sundays for the stated purpose of "capturing 720

minutes, especially for the 5 day assessment."

97.    Facility Visit Summaries also regularly focused on increasing the facility's

average length of stay. For example, a Facility Visit Summary dated May 27, 2005, regarding

Life Care Center of Elyria, in Elyria, Ohio, stated: "[Year To Date] Medicare average length of

stay @ 33 days. **The Corp expectation is 45 days**." (Emphasis added).

### E.    Life Care Pushed Ultra High Through Divisional Initiatives

98.    Certain Life Care divisions implemented special initiatives to increase their Ultra

High RUG levels and Medicare revenue with little regard for the individualized medical needs of

their beneficiaries.

99.    The Heartland Division, for example, set aggressive targets to ensure an increase

in the percentage of Ultra High days billed and the average lengths of stay. As reflected in its

"90 Day Focus Plan," the Heartland Division expected to double the Ultra High percentage of

certain patients from 15.3 percent in May 2006 to 30 percent in August 2006. The plan also

detailed how to increase the lengths of stay of its residents from 34 days in May 2006 to 38 days

in August 2006. Life Care set both these targets based solely on financial considerations and not

on the individualized medical needs of its Medicare beneficiaries.

100.    As part of the Heartland Division's push in 2006 for increased Medicare revenues, Vice President of the Heartland Division, Dick Odenthal, established a "$400 club," which was named after the daily Medicare "book rate" that the Vice President expected facilities in his division to attain for all beneficiaries. The Medicare book rate generally describes the average daily rate at which a nursing facility bills Medicare for its Medicare beneficiaries. As a practical matter, it was extremely difficult to achieve a daily Medicare rate of $400 in 2006 without billing a significant percentage of days at the Ultra High RUG level.

101.    Life Care lauded those facilities and employees who made the $400 club. For example, in a March 23, 2006, email, Michael Reams, Life Care's Senior Vice President of Rehabilitation Services, congratulated a facility's Executive Director and said "Welcome to the 400 club !!!!!!!!!!!"

102.    In another email, an Executive Director asked, "[w]hat are we doing wrong, please send help! I want to be in the 400 Club!" In response, a Life Care official told him that, until proven otherwise, "Every new [evaluation] should be a RU . . . FROM THE GET GO . . . ."

103.    To achieve this goal, the Divisional Vice President instructed rehab management to "think[] outside the box to hit" the Ultra High and Very High RUG levels.

104.    In April 2007, a regional vice president in the Heartland Division told Life Care during his exit interview that the $400 club "placed enormous stress on the [executive directors] to do whatever was necessary (but not always legal or ethical) to be members of this club."

## F.    Life Care Evaluated Its Employees Based On Their Ability To Meet Corporate RUG Level Targets

105.    Life Care also applied corporate pressure by measuring the performance of its employees at every level of the company, in part, on their ability to achieve Ultra High targets.

25

106. Life Care evaluated its Divisional Rehab Directors on their ability to increase the Ultra High percentages for their divisions. Even where Divisional Rehab Directors successfully increased Ultra High utilization, Life Care identified increasing RUG utilization as an area of improvement. For example, in the section of the performance evaluation titled "Goals met and improvements made during review period," Life Care included comments like "Increased RU Therapy," "RU↑ >10%," and "↑ RU level short term rehab >15%."

107. Life Care evaluated its Regional Rehabilitation Directors based on their Ultra High percentages and the average length of stay of the facilities in their regions. For example, in the 2007 annual performance evaluation of the Patriot Region's Regional Rehab Director, Life Care noted his region's Ultra High percentage in 2007 (45.8 percent), as compared to its Ultra High percentage in 2006 (36.3 percent) and against Life Care's "Benchmark" (51.0 percent).

108. Life Care evaluated facility Rehab Managers based on their ability to increase their facilities' Ultra High percentages. Rehab Managers received positive evaluations when they met or exceeded Life Care's Ultra High targets (*e.g.,* "RU scores are above corporate goal-great improvement!"; "Reached over 60% RU's"). Life Care also embedded Ultra High targets into Rehab Manager performance evaluations. For example, in the November 2006 performance evaluation of the Inverrary Rehab Manager, Life Care set a goal of "RU 70-80%."

109. Life Care even evaluated its therapists in part based on their achievement of corporate targets related to Ultra High RUG levels. For example, in the "areas for improvement" section of therapists' performance evaluations, Life Care made comments like "Continue to ↑ focus on RU's," "Doing a good job helping to ↑ our overall RU%", and "Continue to strive to ↑ RU categories."

## G.  Rehab Services Managers Pushed Their Therapists At The Facility Level

110.  At the facility level, Rehab Managers were responsible for ensuring that the therapists provided enough minutes of therapy or services to assign their beneficiaries to the Ultra High level and that the facility could meet Life Care's corporate targets.

111.  Rehab Managers, who were usually trained in only one therapy discipline, set the number of skilled therapy minutes for all therapy disciplines that the therapists had to provide each day to the Medicare beneficiaries.

112.  Some Rehab Managers instructed their therapists to assign patients to the Ultra High RUG category regardless of the patients' diagnosis, physical ability, or current health status.

113.  Rehab Managers regularly set the number of assigned minutes without input from the therapists and sometimes even over the express objections and recommendations of the therapists.

114.  Especially during the look back periods, when the minutes reported on the Minimum Data Set forms determined patient RUG levels and Medicare reimbursements, Rehab Managers demanded that the therapists provide enough minutes of therapy to achieve targeted RUG levels.  For example, in an April 2007 memorandum, the Rehab Manager at Life Care Center of Inverrary instructed her rehabilitation staff: "do not change (decrease) the minutes that are planned out in the PPS book when a patient is in an assessment.  The minutes have been planned to meet a certain RUG category by a certain date."

115.  Life Care policies were clear that Rehab Managers were responsible for meeting RUG targets.  For example, Eastern Division PPS policy stated that the Rehab Manager "will . . . track progress towards the RUG category and to assure the team delivered enough minutes to achieve the targeted RUG level by the set, but flexible" assessment date.

27

116.     Rehab Managers employed different methods to highlight for their therapists those beneficiaries who were in their assessment periods and the number of minutes that the therapists had to get that day to reach the Ultra High RUG level. For example, the Rehab Manager at Life Care Center of Collegedale, in Collegedale, Tennessee, used a dry erase board, while the Rehab Manager at Life Care Center of Port St. Lucie used daily or weekly therapy assignment sheets to accomplish this objective.

117.     Rehab Managers frequently pushed therapists to approach beneficiaries multiple times a day, sometimes as many as 7 or 8 times, in order to meet the number of assigned minutes, even after repeated refusals by the beneficiaries.

118.     For example, on December 6, 2007, an occupational therapy assistant recorded providing therapy to a patient at Valley View Villa, in Fort Morgan, Colorado, who refused service four times. As the notes reflect:

> 1st time pt. had returned to bed from toilet and was covered in sweat and short of breath. 2nd time pt. was sleeping; awoke and refused- asked therapist to come back later. 3rd time therapist was unable to wake pt. 4th time pt. stated he had a headache and his stomach hurt.

Notwithstanding the four refusals, Life Care records indicate that the therapist billed for 15 minutes of therapy.

119.     As instructed in Life Care's "PPS 101 for Therapists" guidance, if a therapist failed to achieve the number of assigned minutes, Rehab Managers commonly added the missed minutes to the target minutes for the following day in order to ensure that the overall number of assigned minutes was met.

120.     Many Rehab Managers confronted therapists who failed to provide the assigned number of minutes or missed the Ultra High RUG level and forced them to write memoranda

28

explaining why they were unable to attain the minutes. Therapists who missed minutes were told how much money they were costing the company.

## H.    Life Care Rewarded Facilities And Therapists That Achieved Corporate Ultra High and Length of Stay Targets

121.    While pressuring those facilities and employees that failed to meet its Ultra High and average length of stay targets, Life Care applauded and rewarded those employees and facilities that met or exceeded its targets.

122.    At the 2006 Annual Rehab Meeting, the Southeast Division was recognized as the "All Star Team" for the highest RU/RV utilization at 80 percent, and the Eastern Division was recognized for achieving the "highest total revenue $$$" at slightly over $20.5 million.

123.    At the 2007 Annual Rehab Meeting awards banquet, Life Care gave awards for "highest increase of book rate," "highest RU," "highest increase in length of stay," and "highest length of stay." At that banquet, the Blue Grass Region was named the "gold region" for having the highest Medicare book rate increase (25 percent), the Sun State region was named the "gold region" for having the highest Ultra High percentage (70.9 percent), the Frontier Region was named the gold region for achieving the highest increase in length of stay (11 percent), and the Hawaii Region was named the gold region for having the highest length of stay (40.10 days).

124.    Similarly, at the 2007 Annual Management Meetings, facility Executive Directors were recognized for their accomplishments, which almost uniformly included meeting or exceeding corporate Ultra High targets. Descriptions of the Executive Directors' accomplishments included "increased RU levels by 26.7 percent from 2006" and "enabled the rehabilitation department to achieve 93% RU/RV with 60 percent X and L information captured." At that meeting Forrest Preston's "Chairman's Award" went to an Executive Director whose facility reached an 83 percent Ultra High/Very High RUG billing level.

29

125. In addition to annual awards, Life Care divisions regularly highlighted the Ultra

High and average length of stay achievements of its facilities in monthly emails. For example, a

June 2007 email from the Divisional Rehab Director of the Eastern Division noted:

> May continued our Rehab Growth! . . . Eastern Division' RU was at an all
> time high of 46.1% (Yea!), placing us 4th out of 6 divisions. I think we
> can do better! Just for your information, the top division, Southeast,
> averaged 67% RU for the month. **The best Region for RU was Blue
> Ridge at 55.1%.**

(Emphasis in original).

126. In addition to recognizing high performing facilities and employees at annual

events, Life Care also gave awards and certificates to facilities and employees throughout the

year for their Ultra High-related achievements. Some of the awards and certificates were for

"highest RU% in one month," "highest RU%," "highest % rehab RUG category," "highest

percentage of RU- Regional and Divisional," and "highest RU/RV Percentage 2007."

127. Notwithstanding the dramatic increases in Ultra High percentages and average

lengths of stay, Life Care never questioned or examined whether these increases were legitimate

or the result of medically unnecessary, unreasonable, or unskilled services.

## I. Life Care Provided Excessive Therapy Services With Limited Physician Oversight, Knowledge or Involvement

128. Medicare requires that physicians or certain other practitioners certify, and then

recertify on a regular basis, to the medical necessity of a patient's treatment in a skilled nursing

facility. A physician must also sign written orders for therapy- before the therapy starts- which

typically includes approving the therapy plan of care or the frequency and duration of therapy.

129. In practice, physicians commonly signed certifications days or a week after the

patient was admitted, or sometimes did not sign at all. Rather than the physician evaluating the

patient, or talking with the therapist who had performed an evaluation, and then prescribing an

order for the duration and frequency of therapy, Life Care therapists would frequently begin

30

therapy treatments, then write up the therapy orders and only then obtain physician approval. Typically, physicians would approve the therapy over the phone, and then sign the order written by the therapist without ever having met the patient or performed an independent evaluation.

130. Many physicians, who often lacked knowledge and training in rehabilitation therapy, relied heavily on therapists to propose a frequency and duration of therapy that was appropriate for the individual patient, not knowing that Life Care had actually set those amounts to meet corporate target RUG levels. Physicians would sometimes sign stacks of certifications and therapy orders without seeing the patients or talking with the therapists, and never knowing whether the therapy was reasonable, useful, or even medically necessary.

131. For example, for one patient at Life Care Center of Inverrary, the physician signed the certification on May 26 – six days after the patient had already been admitted to the SNF. On May 22, before the certification was signed, the physician approved an order for four weeks of occupational therapy, six times a week for the first two weeks then five times a week for the next two weeks. On May 30, the physician approved an order for occupational therapy to be reduced to three times a week for only one more week. On June 2, just three days later, the physician ordered the patient's discharge from therapy. On the same day, however, the physician also signed a re-certification ordering four weeks of occupational therapy, six times a week for the first two weeks then five times a week for the next two weeks. A month later, on July 1, the physician signed another re-certification (on the same page as the prior one), ordering another week of occupational therapy, even though he had already discharged the patient from therapy a month earlier.

132. Some physicians pre-signed their certifications and allowed Life Care to fill in the therapy orders they wanted. Some physicians used a standard, universal prescription for therapy that they ordered on the certifications for every patient, regardless of medical necessity.

31

## VI. LIFE CARE BILLED MEDICARE FOR SERVICES THAT WERE MEDICALLY UNREASONABLE, UNNECESSARY, AND UNSKILLED

133.    In order to meet Life Care's aggressive and oftentimes unrealistic Ultra High and average length of stay targets, Life Care therapists frequently provided services that were medically unreasonable, unnecessary, and unskilled. Instead of developing individualized plans of care that were tailored to a patient's unique clinical characteristics and needs, Life Care therapists commonly churned their Medicare beneficiaries through rote exercises that provided little clinical benefit and served only to inflate the number of minutes Life Care could report on the Minimum Data Set and bill to Medicare and TRICARE.

134.    As a result of Life Care's constant push for billable minutes, its therapists regularly provided services that were medically unreasonable, unnecessary, and unskilled for a variety of non-exclusive, overlapping reasons. As illustrated by the examples below, Life Care therapists subjected many Medicare beneficiaries to Ultra High levels of therapy when their clinical characteristics and physical condition indicated that they could not be reasonably expected to participate in, much less benefit from, those levels of intensive therapy.

### A.    Life Care Billed Medicare for Therapy That Was Medically Unreasonable or Unnecessary

#### 1.    Life Care Billed Medicare for Therapy that was Excessive in Frequency, Duration, and Intensity and Sometimes Potentially Harmful to Patients

135.    Life Care therapists provided and billed Medicare for therapy that was excessive in frequency, duration, or intensity for beneficiaries who could not be reasonably expected to benefit from skilled therapy.

136.    For example, Patient A was a 78-year-old male who was admitted to Life Care's Park View Care Center in Indiana in May 2008. Although Patient A was frail and debilitated at the time of admission, Life Care therapists subjected him to 807 minutes of therapy (316 minutes

32

of physical therapy, 311 minutes of occupational therapy, and 180 minutes of speech therapy), during his very first week of treatment. Life Care provided Patient A with Ultra High levels of rehabilitation therapy from May 7 until May 24. Patient A was readmitted to the hospital on May 24 and returned to the nursing home on May 28. Although Patient A was readmitted to the nursing home for palliative care, Life Care therapists provided 269 minutes of therapy on May 31 and June 1, 2008. Patient A died early on June 2, 2008.

137.    Patient B was an 85-year-old resident of Life Care's University Park Center in Colorado in September and October 2008. Patient B was admitted to the hospital for significant heart problems and functional deficits due to long-term obesity and blindness. Before her admission to University Park Center, Patient B's hospital records indicated that she was non-ambulatory and required the assistance of two nurse's aides twice a day to assist her in her activities of daily living. Nevertheless, Life Care set unrealistic long-term goals for Patient B considering her prior level of function and then made her perform repetitive arm exercises and transfers that were not tailored to Patient B's conditions or needs and did not require the unique skills of a therapist. Life Care billed Medicare for 77 days at the Ultra High level for Patient B. At the time of discharge, Patient B's unrealistic goals had not been met.

138.    From March 7, 2006, to March 27, 2006, Life Care billed at the Ultra High level for Patient C, an extremely frail 80-year-old resident of Life Care Center of Columbia in South Carolina. Although the physical therapist's notes indicated that on March 21, 2006, Patient C was "very lethargic, hard to arouse, and unable to participate successfully in treatment," Life Care recorded 35 minutes of physical therapy that day. The next day, Patient C was placed in a standing frame (a piece of equipment used by therapists to secure a patient in a standing position and support those areas where the patient is too weak to support herself) despite the fact that she required assistance to control her head and to open her eyes. Both the physical and occupational

33

therapist recorded providing 42 minutes each for the time Patient C spent in the standing frame. Patient C died five days later.

139. Life Care therapists provided, and Life Care billed for, therapy that sometimes jeopardized the health of Medicare patients who were imminently terminal, fatigued, sick, or otherwise medically unstable.

140. For example, Patient D was a 92-year-old resident of Life Care of Orlando in Florida who was dying of metastatic cancer (melanoma) that had spread to his brain and lungs. Patient D had received palliative radiation therapy and was becoming weaker and more medically fragile after that treatment. Nevertheless, Life Care therapists recorded at least two hours a day of therapy in all three disciplines at the Ultra High level for Patient D from July 24, 2007, until his death on August 8, 2007. Two days before Patient D's death, he was spitting out blood. Life Care therapists, however, still recorded 48 minutes of physical therapy, 47 minutes of occupational therapy, and 30 minutes of speech therapy that very day. The day Patient D died, Life Care therapists recorded 35 minutes of physical therapy and had him scheduled for occupational therapy later in the day.

## 2. Life Care Increased Therapy During the Assessment Reference Period Without Clinical Justification to Increase Medicare Payment

141. To ensure that it could bill Medicare and TRICARE for a patient at the Ultra High level, Life Care therapists commonly "ramped up" the amount of therapy they provided to patients during assessment periods with little clinical justification or support. "'Ramping' generally describes the practice of providing significantly more minutes of therapy during the assessment periods than outside of the assessment periods in order to maximize the RUG level at which the nursing facility can bill for a patient. A typical pattern was that therapy was provided at 30-45 minutes per day the week prior to the assessment period, increased to 65-75 minutes per

34

day during the assessment period, and then reduced again to 30-45 minutes after the assessment period, without a clinical justification for the change.

142. For example, April 2008 treatment notes for Patient E at Life Care's Garden Courts facility in Florida, show that substantially more minutes of occupational and physical therapy were recorded during the assessment reference period than other non-assessment periods. The occupational therapy treatments between April 1, 2008, and April 11, 2008, were for arm bike, pulley exercise, and transfers. These types of services remained essentially unchanged. During the assessment reference period beginning on April 3, 2008, however, the occupational therapist recorded nearly double the daily minutes. Likewise, physical therapy increased the amount of therapy by approximately fifteen minutes each day during the assessment reference period. Nothing in Patient E's medical record indicates that the increase in therapy minutes was in response to a change in her clinical needs. Life Care billed Medicare at the Ultra High level for Patient E. Patient E would not have met the number of minutes of therapy required for the Ultra High level without the increased minutes recorded during the assessment reference periods.

143. Similarly, Patient F was a 92-year-old resident of Life Care's Collegedale facility in Tennessee from May through August 2006. On May 17, 2006, the fifth day of Patient F's first assessment reference period, Life Care's Rehab Manager recorded providing 153 minutes of physical therapy. Combined with the occupational and speech therapy also provided, Patient F was reportedly in therapy for more than 300 minutes, or 5 hours, that day. Someone in Patient F's physical condition would be unable to participate in or would be harmed by such an excessive amount of therapy in a single day. In the previous four days combined, only 205 minutes of therapy had been recorded for Patient F. There was no clinical support for the increased minutes.

35

### 3. Life Care Used Modalities that Were Unnecessary and of Unreasonable Duration to Increase the Number of Minutes of Therapy Recorded

144. "Modalities" generally describe treatments such as heat, cold, and electrical stimulation that are used to produce a tissue response to help reduce pain and inflammation, or to strengthen, relax, or heal muscles. Modalities are typically used as an adjunct to active therapy to decrease impairments and improve functions. Some modalities, like heat treatments (*e.g.*, hot packs and infra-red treatments) or whirlpool baths, do not ordinarily require the skills of a qualified therapist unless there is a particular patient complication (*e.g.*, patient has an open wound, fracture, or other complication). Medicare Benefit Policy Manual 100-2, Ch. 8, §30.4.1.2.

145. Life Care therapists regularly recorded time they spent using modalities that were unnecessary and of unreasonable duration as a way to inflate the number of billable therapy minutes and their beneficiaries' RUG levels.

146. Electrical stimulation is one modality commonly used by Life Care therapists to inflate the number of minutes reported.

147. For example, Patient G was an 88-year-old with colon cancer who was admitted to Life Care Center of East Ridge in Tennessee on February 22, 2007. She remained at Life Care for 99 days, 79 of which were billed at the Ultra High level. Although her physical therapy evaluation reported intermittent hip and knee pain, there were no objective measurements of pain and no mention of any goals to reduce pain. Nevertheless, over 67 percent of Patient G's treatment minutes were for electrical stimulation. Indeed, on several days the only treatment provided to Patient G was 60 minutes of electrical stimulation. Such an excessive level of electrical stimulation was neither skilled nor beneficial to Patient G.

36

### 4. Life Care Billed for Services Provided to Medicare Beneficiaries Who Should Have Been Discharged from Therapy

148. The determination of when a patient was discharged from therapy, which should typically be made by a treating therapist, was often made by Life Care corporate employees who had little or no knowledge of the patient's condition. This allowed Life Care to continue billing Medicare for beneficiaries who should have been discharged.

149. For example, Patient H was a 73-year-old patient at Life Care Center of Bridgeton in Missouri who received 100 days of Ultra High therapy. On day 59 of Patient H's stay, the physical therapist informed the Rehab Manager that Patient H had reached his maximum potential. On day 64, the occupational therapist requested from the Rehab Manager and nurse that Patient H be discharged because he was no longer benefitting from skilled therapy. On day 71, the occupational therapist documented that Patient H remained as previously noted and that he had reached the maximum benefit of therapy. Nevertheless, both physical therapy and occupational therapy continued to be provided to Patient H until the exhaustion of his 100-day Medicare benefit.

### 5. Other Examples of Life Care's Provision of Medically Unreasonable and Unnecessary Services

150. Life Care improperly placed patients into group therapy that was not related to their plans of care or that included activities in which the patient could not be reasonably expected to participate as a way to inflate their therapy minutes. Group therapy is where a single therapist conducts the same therapy exercises with two to four beneficiaries at the same time. For example, if a therapist provided 60 minutes of the same therapy to three beneficiaries at the same time, then Life Care could include the full 60 minutes of time when determining each patient's RUG level. Because it was the patient's time in therapy that counted towards the RUG,

37

not the therapist's time, using group therapy provided Life Care with a means to easily increase a patient's total therapy minutes, and thus, their RUG level

151.   For example, Patient I was a 62-year-old male resident at Life Care Center of Columbia in South Carolina from April until July 2007. Patient I's 5-day, 14-day, and 30-day Minimum Data Sets indicated that he did not walk and was totally dependent (*i.e.,* required the assistance of at least two people) for bed mobility, transfers, toilet use, and bathing. The physical therapy evaluation noted that Patient I required the maximum level of assistance to move from lying down on his back to sitting upright and then moving from a sitting position to lying down on his back. Nevertheless, Life Care billed Medicare for group therapy focused on standing exercises in which Patient I could not reasonably be expected to participate in or receive any benefit from. Life Care billed Medicare for Ultra High therapy from April 25, 2007, until June 23, 2007.

152.   Life Care also regularly billed for unreasonable and unnecessary therapy that was provided to Medicare beneficiaries in disciplines that the beneficiaries did not require.

153.   Life Care's Rehabilitation Services Manual stated that "[e]ach Discipline needs to ensure that the minutes are managed daily and work together so that if one discipline is falling short of their target, another discipline may be able to capture more."

154.   In practice, Rehab Managers implemented this company guidance by ordering therapists in other disciplines (*e.g.*, occupational therapy and speech language pathology) to "make up" assigned minutes that another therapist in a different discipline (*e.g.*, physical therapy) refused to provide, for example, because they believed additional therapy was medically unnecessary or unreasonable. Rehab Managers regularly reassigned "missed minutes" to other therapy disciplines regardless of patient need in order to attain the number of assigned minutes,

38

particularly during assessment periods. This type of "minute management" was critical to the facility's ability to meet Life Care's Ultra High targets.

## B. Life Care Billed Medicare for Services That Did Not Require the Skills of a Rehabilitation Therapist

155. To meet the required number of minutes to bill Medicare at the Ultra High level, Life Care often improperly included time on the Minimum Data Set that its therapists spent providing routine or custodial services that did not require the skills of a rehabilitation therapist and that should have been performed by non-skilled personnel.

156. For example, Life Care therapists regularly billed time that the beneficiaries spent working on repetitive exercises that, under the circumstances, did not require skilled care, such as the stationary bike, or time that the therapists spent simply transferring, dressing, toileting, feeding, and bathing beneficiaries rather than training the beneficiaries to perform the activities or exercises themselves.

157. For example, Patient J was an 82-year-old female who resided at Life Care's Gardens Court facility in Florida. Patient J's physical therapy documentation shows that her treatment largely consisted of unskilled services. Such treatment included the same exercises every day, routine transfers in and out of bed, and walking with a walker. There was no description of walking problems or other issues that required a skilled therapist. Indeed, in September 2007, physical therapy and restorative nursing were providing the exact same services for walking and transfers. Physical therapy, however, recorded such services as skilled services and Life Care billed Medicare at the Ultra High level for 30 days in September and 2 days in October. Patient J remained at Life Care for 100 days, 90 of which were billed at the Ultra High level.

39

158. Unskilled interventions were also billed by more than one discipline. Stationary bicycles, arm bikes, or leg pedal bikes were used frequently during therapy sessions by both physical and occupational therapists without any benefit to the patient.

## C. Examples of False Claims and False Statements

159. Attached to and made a part of this Complaint is Exhibit 1,[2] which contains information identifying the false claims made by Life Care for the Medicare patients discussed in section VI of this Complaint. The claims identified in Exhibit 1 are false because they were submitted to Medicare for payment for therapy provided during periods for which the patient was ineligible for such payment or the patient was eligible for a lower level of payment than claimed.

160. Attached to and made a part of this Complaint is Exhibit 2, which contains information identifying the false statements made by Life Care for the beneficiaries discussed in section VI of this Complaint. The false statements identified in Exhibit 2 consist of the false Minimum Data Sets, which purport to list the minutes of skilled, medically necessary therapy provided to the patient. The statements are false because the minutes listed include therapy that was medically unreasonable, unnecessary, or unskilled.

## VII. LIFE CARE KNEW THAT IT WAS BILLING MEDICARE FOR MEDICALLY UNREASONABLE, UNNECESSARY, AND UNSKILLED SERVICES

161. Life Care knew that Medicare and TRICARE only paid for skilled rehabilitative therapy services that were reasonable and necessary, consistent with the nature and severity of the patient's illness or injury, the patient's particular medical needs, and accepted standards of medical practices.

---

[2] The exhibits attached to the Complaint identify the patients by letter and omit the patient identification numbers to protect patient privacy. The United States will serve defendant with exhibits that identify each patient by name and patient identification number.

162. Life Care also knew, since at least September 2008, that the provision of medically unnecessary rehabilitation therapy was an area of concern identified by the HHS Office of Inspector General ("HHS-OIG").

163. In September 2008, the HHS-OIG published supplemental guidance to skilled nursing facilities that identified therapy services and in particular the "improper utilization of therapy services to inflate the severity of RUG classifications and obtain additional reimbursement" as a fraud and abuse risk area. OIG Supplemental Compliance Program Guidance for Nursing Homes, 73 Fed. Reg. 56832, 56840 (Sept. 30, 2008).

164. As the HHS-OIG further noted:

> Unnecessary therapy services may place frail but otherwise functioning residents at risk for physical injury, such as muscle fatigue and broken bones, and may obscure a resident's true condition, leading to inadequate care plans and inaccurate RUG classifications.

*Id.*

165. HHS-OIG "strongly advise[d] nursing facilities to develop policies, procedures, and measures to ensure that residents are receiving medically appropriate therapy services." *Id.*

## A. Life Care Received Numerous Complaints From Its Employees About The Corporate Targets And Pressure

166. Life Care knew that its push for increased Ultra High billings and longer average lengths of stay compromised the professional judgment of its rehabilitation therapy staff and caused them to provide medically unreasonable, unnecessary and unskilled services.

167. Life Care's compliance office, known as the Integrity Services Division, received dozens of internal complaints from around the country regarding Life Care's corporate pressure tactics.

41

168.    These complaints alleged, among other things, that therapists provided medically

unnecessary therapy, that supervisors directed employees to increase RUG levels, that

beneficiaries were not discharged until they had exhausted all 100 days of their Medicare Part A

SNF benefit, that facility supervisors asked the rehabilitation therapy staff to treat people who

did not require skilled therapy, that a Rehab Manager altered a Minimum Data Set form in order

to increase a patient's RUG level, and that Life Care improperly billed for services provided by

unsupervised or unlicensed therapists.

169.    For example, a Life Care summary of a hotline call to Integrity Services regarding

Life Care Center of Columbia, in Columbia, South Carolina, in February 2009, stated:

> It was alleged that therapists are asked to add minutes when they [are]
> short projected minutes during the assessment periods. They are asked
> "are you sure you didn't walk by the room and answer a call light or
> something?" They are asked to go back after the minutes are in and add
> more. In addition, it was alleged that if the therapist asked refuses to add
> minutes then another therapist will be asked until someone does it. It was
> also alleged that therapist[s] are put on an action plan if they do not attain
> a sufficient number of RU's. The allegation was made that the therapist
> must maintain 80% efficiency. If in the window and do not get the
> minutes then sometimes the window is just moved. It was stated that the
> [Regional Rehab Director] always compares Columbia with Charleston,
> and asks them why they can not get the "high U and Part B numbers" that
> Charleston gets. It was alleged that the therapist[s] feel constant pressure.

170.    In addition to its Integrity Services Division, Life Care's corporate Rehabilitation

Services office also received complaints directly from its therapists. For example, in May 2007,

the Rehab Manager for Life Care Center of Estero in Estero, Florida, quit her job with Life Care.

Just prior to quitting, she wrote an email on May 7, 2007, to her Regional Rehab Director, who

had recently visited the Estero facility. The email responded to a number of criticisms and

suggestions the Regional Rehab Director had made. In that email, the Estero Rehab Manager

noted:

42

The therapists know what the patients can tolerate. Anyone who looks solely at the RUG sheets and minutes and not at the chart of the patient, has no idea why minutes are missed. A patient could be sick or dying. Let me give an example here of Mrs. S. who we were made to put into an RU cat[a]gory even after the therapists who treat[ed] her told me that she could not tolerate that level. She expired last Friday . . . in front of the building while being taken to the doctor. I wonder if we had anything to do with hastening that process along.

171. In that same email, the Estero Rehab Manager noted that the "Estero therapists are extremely competent, ethical and appropriate with their clinical judg[]ments regarding patient care. Asking them to return 4-5 times to patients to attain high minutes for an RU status seems unreasonable and I shall not insult their intelligence with such a request."

172. Following the Estero Rehab Manager's departure, the *entire* Estero rehabilitation staff signed a letter to Michael Reams, Senior Vice President of Rehabilitation Services, noting that "[w]e as a department, feel that middle management has placed an inordinate amount of pressure on both [the rehabilitation director] and on our department to maximize Medicare reimbursement levels, at times without regard to the appropriate plan of care that should be delivered to each patient."

173. The Estero staff further observed that:

> [r]ecently, the financial goals of Life Care appear to have overshadowed the importance of complying with Life Care's own policy regarding the . . . False Claims Act. We feel that, rather than being encouraged to comply with the policy, we have been encouraged to maximize reimbursement even when clinically inappropriate. The medical complexity of the incoming patients and seasonal fluctuations in population in Southwest Florida area influence the reimbursement earned by our facility, sometimes negatively. However, to maintain compliance with the Medicare and Medicaid anti-abuse legislation, we cannot allow such factors to cloud our thinking as clinicians. Our purpose in bringing our concerns to your attention is not to cast blame, but to comply with our duty, as stated in the Life Care Code of Conduct, to report suspected violations of the Code and corporate policies.

43

174. As such, the Estero staff reported that:

> We have observed that [the Director of Rehabilitation] has recently been
> placed in the difficult position between meeting Life Care's financial goals
> and allowing her staff to exercise its professional judgment in formulating
> an appropriate plan for Life Care's patients. We believe that the apparent
> tension between middle management's goals of maximizing
> reimbursement and the rehab department's desire to provide clinically
> appropriate care has been a factor in [the director's] decision to resign
> from her position.

175. Notwithstanding the compliance concerns expressed in the Estero's staff's letter,

Estero's Ultra High days continually increased during the relevant period. While Ultra High

days constituted 39 percent of Estero's Medicare rehabilitation days in 2006, Ultra High days

constituted 66 percent of Estero's Medicare rehabilitation days in 2011.

176. In addition to complaints from within the company, Life Care received at least

one complaint from outside the company about its corporate pressure tactics. In December 2007,

a rehabilitation therapy contractor voluntarily terminated its contract to provide rehabilitation

services at Life Care Center of Yuma, in Yuma, Arizona, because the contractor believed that

Life Care was asking therapists to provide unnecessary rehab therapy designed primarily to

increase Life Care's revenue rather than meet patient needs.

177. In its letter to Life Care, the contractor expressed its serious concern about Life

Care's ethics and billing practices:

> In the current rehab sector, the need for cost containment as well as
> achieving high productivity standards is the main priority of a corporation.
> The pressure to achieve 72 minutes per patient/per discipline daily is a
> questionable practice standard. If 72 minutes is appropriate and can be
> achieved through skilled interventions, then it is successful for the
> beneficiaries' well being and the facilities reimbursement. When 72
> minutes are being billed through repetitive exercises with no focus on
> quality, progression, and functional carryover it is fraudulent. It is
> disheartening to see staff being so focused on achieving 72 minutes with
> all beneficiaries in order to meet corporate compliance for RUGS
> categories. When treatments are focused on tasks with no relevance

44

towards patient goals and functional outcomes, how does this translate over to quality patient care?

## B. Life Care Ignored And Minimized Complaints Regarding Corporate Pressure And Retaliated Against Those Who Complained

178. Although the Life Care Integrity Services Policy Manual indicated that the Chief Integrity Services Officer or designee would be responsible for investigating hotline complaints to Integrity Services, in practice, the investigations were frequently conducted by the very Life Care employees responsible for the Ultra High targets and pressure, including the Vice President of Rehabilitation Practice Standards and other corporate rehabilitation staff.

179. Although the Integrity Services Policy Manual provided that hotline complaints would be treated confidentially and emphasized that Life Care would not retaliate against employees who reported a complaint to Integrity Services, Life Care's investigations frequently focused more on rooting out the complainant than investigating or addressing the problem identified in the complaint.

180. An informal study conducted by Integrity Services found that Life Care terminated approximately 57 percent of the employees who provided their names within three weeks of filing their complaint.

181. Instead of supporting Integrity Services' compliance efforts, Life Care frustrated those efforts by interfering with Integrity Services' investigations, impeding access by Integrity Services staff to potentially relevant data, and pressuring Integrity Services to close complaint cases. Likewise, Life Care's Chairman of the Board, Forrest Preston, and Chief Operating Officer, Cathy Murray, forbade Integrity Services from making unannounced visits to Life Care facilities.

45

182. Numerous therapists resigned due to the constant corporate pressure to provide excessive therapy and their unwillingness to subject Medicare beneficiaries to unnecessary rehabilitation therapy just to increase beneficiaries' RUG levels.

183. Numerous corporate divisional and regional employees also quit because of Life Care's constant pressure to increase RUG levels.

### Count I: False or Fraudulent Claims
(31 U.S.C. § 3729(a)(1)(A))
(previously 31 U.S.C. 3729(a)(1) (1986))

184. The United States repeats and realleges paragraphs 1 – 183, as if fully set forth herein.

185. The defendant knowingly presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), specifically, claims for payment to Medicare and TRICARE for medically unreasonable, unnecessary and unskilled rehabilitation therapy.

186. Because of the defendant's acts, the United States sustained damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

### Count II: False Statements
(31 U.S.C. § 3729(a)(1)(B))
(previously 31 U.S.C. 3729(a)(2) (1986))

187. The United States repeats and realleges paragraphs 1 - 186, as if fully set forth herein.

188. The defendant knowingly made, used, or caused to be made or used a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), including false Minimum Data Sets.

46

189.     Because of the defendant's acts, the United States sustained damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

### Count III:  Unjust Enrichment

190.     The United States repeats and realleges paragraphs 1- 189, as if fully set forth herein.

191.     By virtue of submitting claims to Medicare and TRICARE for medically unreasonable, unnecessary, and unskilled services, the defendant obtained inflated payments from the United States.  Thus, the defendant was unjustly enriched at the expense of the United States, in such amounts, as determined at trial.

### Count IV:  Payment By Mistake

192.     The United States repeats and realleges paragraphs 1 – 191, as if fully set forth herein.

193.     The defendant submitted claims for Ultra High rehabilitation therapy to Medicare and TRICARE when that level of care was not medically unnecessary.  The United States paid more money to Life Care than it would have had the defendant not submitted claims for medically unreasonable and unnecessary rehabilitation therapy.

### Count V:  Conversion – Life Care

194.     The United States repeats and realleges paragraphs 1 – 193 as if fully set forth herein.

195.     By virtue of the acts described, and specifically by submitting claims and obtaining payment for rehabilitation therapy services that were medically unnecessary, unreasonable, unskilled or otherwise failed to meet Medicare or TRICARE criteria for coverage

47

and payment, Defendant Life Care has appropriated the United States' property to its own use and benefit, and has exercised dominion of such property in defiance of the United States' rights.

196. Defendant Life Care is, therefore, liable to the United States for actual damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor against Life Care Centers of America as follows:

I. On the First and Second Counts under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

II. On the Third Count for unjust enrichment, for the damages sustained and/or amounts by which Life Care was unjustly enriched or which Life Care retained obtained monies to which it was not entitled, plus interest, costs, and expenses.

III. On the Fourth Count for payment by mistake, for the amounts by which Life Care obtained to which it was not entitled, plus interest, costs, and expenses.

IV. On the Fifth Count for conversion, for the damages sustained by the United States in an amount to be determined at trial, plus interest, costs and expenses.

V. All other relief as may be required or authorized by law and in the interests of justice.

Dated: November 28, 2012          Respectfully submitted,

STUART F. DELERY
Principal Deputy Assistant Attorney General

*Andy Mao / by RCM with perm.*

DANIEL R. ANDERSON
MICHAEL D. GRANSTON
ANDY J. MAO, PA Bar No. 82986
AMY L. EASTON, DC Bar No. 463710
JONATHAN GOLD, Maryland Bar Member
Attorneys, Civil Division
United States Department of Justice
P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0539


WILLIAM C. KILLIAN
United States Attorney

*Elizabeth S. Tonkin / by RCM with perm.*

ELIZABETH S. TONKIN, TN BPR #010305
ROBERT C. McCONKEY, III, TN BPR #018118
Assistant United States Attorneys
United States Attorney's Office
800 Market Street, Suite 211
Knoxville, TN 37902
(865) 225-1654
betsy.tonkin@usdoj.gov
Robert.mcconkey@usdoj.gov


Of Counsel:

Jennifer Aldrich
Assistant United States Attorney
United States Attorney's Office for the
District of South Carolina
1441 Main Street, Suite 500
Columbia, South Carolina 29201
(803) 343-3176
Jennifer.aldrich@usdoj.gov

49

Amy Berne
Assistant United States Attorney
United States Attorney's Office for the
Northern District of Georgia
600 Richard B. Russell Federal Bldg.
75 Spring Street, S.W.
Atlanta, Georgia 30303
(404) 581-6261
amy.berne@usdoj.gov

Zachary A. Cunha
Assistant United States Attorney
United States Attorney's Office for the
District of Massachusetts
One Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3387
Zachary.Cunha@usdoj.gov

Lacy R. Harwell, Jr.
Assistant United States Attorney
United States Attorney's Office for the
Middle District of Florida
400 North Tampa Street, Suite 3200
Tampa, FL 33602
(813) 274-6000
Randy.Harwell@usdoj.gov

Theodore L. Radway
Assistant United States Attorney
United States Attorney's Office for the
 District of Columbia
555 4th Street, NW
Washington, DC 20530
(202) 252-7874
ted.radway@usdoj.gov

Susan Torres
Assistant U.S. Attorney
United States Attorney's Office for the
 Southern District of Florida
99 N.E. 4th Street
Miami, Florida 33132
(305) 961-9331
susan.torres@usdoj.gov

Edwin G. Winstead
Assistant United States Attorney
U.S. Attorney's Office for the District of Colorado
1225 17th Street, Suite 700
Denver, CO 80202
(303) 454-0102
Edwin.Winstead@usdoj.gov

Case 1:08-cv-00251-HSM-CHS Document 69 Filed 11/28/12 Page 51 of 53 PageID #: 367

# EXHIBIT 1

| Name | Life Care Facility | Claim Number | Date Claim(s) Received |
|------|--------------------|--------------|------------------------|
| Patient A | Parkview Care Center | 20815900775702 | June 5, 2008 |
| Patient B | University Park Care Center | 20828001527002 | October 6, 2008 |
| | University Park Care Center | 20831100466602 | November 6, 2008 |
| Patient C | Life Care Center of Columbia | 20610315450104 | April 13, 2006 |
| Patient D | Life Care Center of Orlando | 20721801318502 | August 6, 2007 |
| | Life Care Center of Orlando | 20725001139402 | September 6, 2007 |
| Patient E | Gardens Court | 20812704469202 | May 5, 2008 |
| | Gardens Court | 20815703080402 | June 4, 2008 |
| Patient F | Life Care Center of Collegedale | 20615802453502 | June 6, 2006 |
| Patient G | Life Care Center of East Ridge | 20709503401602 | April 5, 2007 |
| | Life Care Center of East Ridge | 20712400774702 | May 4, 2007 |
| | Life Care Center of East Ridge | 20715800472404 | June 7. 2007 |
| Patient H | Life Care Center of Bridgeton | 20721800342002 | August 6, 2007 |
| | Life Care Center of Bridgeton | 20725301022302 | September 7, 2007 |
| Patient I | Life Care Center of Columbia | 20712902094402 | May 11, 2007 |
| | Life Care Center of Columbia | 20716300669504 | June 12, 2007 |
| | Life Care Center of Columbia | 20719001387602 | July 9, 2007 |
| Patient J | Gardens Court | 20721503832202 | August 3, 2007 |
| | Gardens Court | 20724905952802 | September 6, 2007 |
| | Gardens Court | 20727702228602 | October 4, 2007 |
| | Gardens Court | 20731602000202 | November 12, 2007 |

EXHIBIT 2

| Name | Assessment Reference Date | Life Care Facility | Speech Therapy Days | Speech Therapy Minutes | Occupational Therapy Days | Occupational Therapy Minutes | Physical Therapy Days | Physical Therapy Mintues | Total Minutes |
|------|---------------------------|--------------------|---------------------|------------------------|---------------------------|------------------------------|-----------------------|--------------------------|---------------|
| Patient A | 5/13/2008 | Parkview Care Center | 4 | 180 | 5 | 311 | 5 | 316 | 807 |
| | 5/16/2008 | Parkview Care Center | 5 | 224 | 5 | 264 | 5 | 288 | 776 |
| Patient B | 8/21/2008 | University Park Care Center | 0 | 0 | 6 | 398 | 5 | 342 | 740 |
| | 9/20/2008 | University Park Care Center | 0 | 0 | 6 | 426 | 5 | 365 | 791 |
| | 10/20/2008 | University Park Care Center | 0 | 0 | 6 | 398 | 5 | 329 | 727 |
| Patient C | 3/17/2006 | Life Care Center of Columbia | 5 | 180 | 6 | 307 | 6 | 287 | 774 |
| Patient D | 7/31/2007 | Life Care Center of Orlando | 5 | 261 | 6 | 311 | 5 | 224 | 796 |
| | 8/3/2007 | Life Care Center of Orlando | 6 | 295 | 6 | 294 | 6 | 352 | 941 |
| Patient E | 4/9/2008 | Gardens Court | 0 | 0 | 5 | 326 | 7 | 432 | 758 |
| Patient F | 5/19/2006 | Life Care Center of Collegedale | 5 | 280 | 5 | 210 | 4 | 338 | 828 |
| Patient G | 3/5/2007 | Life Care Center of East Ridge | 0 | 0 | 6 | 375 | 6 | 346 | 721 |
| | 3/25/2007 | Life Care Center of East Ridge | 0 | 0 | 6 | 360 | 7 | 433 | 793 |
| | 4/12/2007 | Life Care Center of East Ridge | 0 | 0 | 6 | 405 | 6 | 392 | 797 |
| Patient H | 7/3/2007 | Life Care Center of Bridgeton | 0 | 0 | 6 | 459 | 6 | 416 | 875 |
| | 8/2/2007 | Life Care Center of Bridgeton | 0 | 0 | 6 | 431 | 5 | 370 | 801 |
| Patient I | 5/1/2007 | Life Care Center of Columbia | 0 | 0 | 6 | 343 | 6 | 413 | 756 |
| | 5/5/2007 | Life Care Center of Columbia | 0 | 0 | 5 | 366 | 5 | 390 | 756 |
| | 5/23/2007 | Life Care Center of Columbia | 0 | 0 | 6 | 403 | 5 | 348 | 751 |
| Patient J | 7/12/2007 | Gardens Court | 0 | 0 | 6 | 394 | 6 | 390 | 784 |
| | 7/15/2007 | Gardens Court | 0 | 0 | 5 | 325 | 7 | 435 | 760 |
| | 7/25/2007 | Gardens Court | 0 | 0 | 5 | 341 | 6 | 395 | 736 |
| | 8/26/2007 | Gardens Court | 0 | 0 | 6 | 409 | 5 | 326 | 735 |